SUSAN L. CARNEY, Circuit Judge,
concurring:
I concur, reluctantly, in the majority’s detailed and carefully reasoned opinion striking down Vermont Acts 74 and 160. My reluctance stems not from any flaw in the majority’s analysis, but rather from my concern that Congress, in enacting the Atomic Energy Act (“AEA”), did not intend the result we reach. Rather, we are led to our conclusion principally by an expansive gloss on the preemptive scope of the AEA first set forth in Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (“Pacific Gas ”). There, the Supreme Court instructed that “[a] state moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field” and would therefore be preempted. Id. at 213, 103 S.Ct. 1713 (emphasis added).
As Judge Droney persuasively demonstrates, the State legislative record before us is “replete with references to radiological safety.” Maj. Op. at 422. No reader of this record can fairly claim that the statutes at issue were not “grounded in safety concerns.” Pacific Gas, 461 U.S. at 213, 103 S.Ct. 1713. Acts 74 and 160 therefore run afoul of the dictate of Pacific Gas.
And yet, in Pacific Gas, the Court upheld a State moratorium on the construction of nuclear power plants, declining to look too closely at the State’s motivation. Cognizant of that setting, we might feel free to discount the “grounded in safety concerns” phrase as merely a stray comment. But it undeniably captures the full thrust of the Court’s opinion: in Pacific Gas, the Court stressed that “[a] state prohibition on nuclear construction for safety reasons would ... he in the teeth of the Atomic Energy Act’s objective to insure that nuclear technology be safe enough for widespread development and use — and would be preempted for that reason.” Id. at 213, 103 S.Ct. 1713 (emphasis added). And the Pacific Gas majority pointedly declined to accept the more tailored view of the preempted field offered by Justice Blackmun in concurrence, when he suggested instead that “Congress has occupied not the broad field of ‘nuclear safety concerns,’ but only the narrower area of how a nuclear plant should be constructed and operated to protect against radiation hazards.” Id. at 224, 103 S.Ct. 1713. Furthermore, not long after, in both Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), and English v. General Electric Co., 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), the Court reiterated its *435 allegiance to the preemption contours it drew in Pacific Gas.
I write separately to emphasize that it is principally the judicial phrase “grounded in safety concerns,” and not the Court’s holdings or the text of the Atomic Energy Act, that compels us to strike down Vermont’s statutes. Particularly in the context of a Congressional enactment that contains protection for State and local interests, 42 U.S.C. § 2018, and indeed invites State-Federal cooperation, id. § 2021, it seems anomalous to conclude that nothing more than the Vermont legislature’s expression of concern about nuclear safety is needed to invalidate these largely procedural statutes.
As the Court recently observed, “Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect.” Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2500, 183 L.Ed.2d 351 (2012). The “[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States.” Pacific Gas, 461 U.S. at 205, 103 S.Ct. 1713; see also Frost v. Corp. Comm’n, 278 U.S. 515, 534, 49 S.Ct. 235, 73 L.Ed. 483 (1929) (“[A] franchise to operate , a public utility is not like the general right to engage in a lawful business ... [but] is of the essence of a special privilege that ... may be granted or withheld at the pleasure of the state----”) (Brandéis, /., dissenting). Repeatedly, we have held that we will not find a federal statute to supersede a State’s exercise of its historic police powers “unless it was ‘the clear and manifest purpose of Congress’ to do so.” N.Y. SMSA Ltd. P’ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir.2010) (per curiam) (quoting Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)). But the outcome we reach today does not, to my mind, reflect a “clear and manifest purpose of Congress.” Based primarily on Vermont’s general concern for safety and public health rather than on any finding that its statutes actually intrude on the field of radiological safety, our decision seems to me to invite a reconsideration— one that our Court is not free to undertake — of the preemptive boundaries set in Pacific Gas.
In thinking about preemption in the AEA context, it is important to distinguish between two categories of State laws. The first consists of State laws that impose concrete safety requirements other than those imposed by the Nuclear Regulatory Commission (“NRC”). A State requirement that nuclear power plants use a particular type of backup generator or a particular method of protecting against leaks falls within this category. The second category consists of State laws that do not in their language or operation intrude upon the field of radiological safety. A legislative decision to permit plant construction or to deny continued operation of a plant at the expiration of a license period, for example, would fall into this category.
I have no doubt that Congress intended to preempt State laws that fall within the first category. See Pacific Gas, 461 U.S. at 211-12, 103 S.Ct. 1713. But I am less convinced that Congress intended to foreclose States from enacting laws that fall within the second category. After all, the AEA — while expressing a federal intent to support the introduction of nuclear power — does not require any State to host nuclear power plants. Id. at 205, 103 S.Ct. 1713 (“Even a brief perusal of the [AEA] reveals that, despite its comprehensiveness, it does not at any point expressly require the States to construct or authorize nuclear powerplants or prohibit the States from deciding, as an absolute or *436 conditional matter, not to permit the construction of any further -reactors.”). Indeed, in Pacific Gas the Court seemed to recognize the possibility that, consistent with the AEA, a State that once agreed to the construction of a nuclear plant within its borders might, at an appropriate inflection point, change course. Id. at 223, 103 S.Ct. 1713 (“[T]he legal reality remains that Congress has left sufficient authority in the States to allow the development of nuclear power to be slowed or even stopped for economic reasons.”).
Acts 74 and 160 fall within the second category of State laws. They alter the State’s decision-making process with respect to the plant. To be sure, in requiring that Vermont Yankee obtain State legislative approval before it may continue operations, they place the State legislature in a position to foil judicial review of its decision. Maj. Op. at 427. They may thereby enable the State to reject the plant’s bid for a new operating license based on an amalgam of concerns, including general safety concerns, or general safety concerns alone. They do not, however, impose any safety requirements at all on the plant. To the extent Act 74 incorporates a memorandum of understanding that imposes safety-related requirements on Vermont Yankee relating to cask storage, it is clearly preempted. The presence of these few requirements, however, serves to highlight the limited scope of the remaining provisions of the Acts.
The AEA does not commit every decision related to the generation of nuclear power to the federal government; rather, it provides for “the dual regulation of nuclear-powered electricity.” Pacific Gas, 461 U.S. at 211-212, 103 S.Ct. 1713. Under the AEA’s approach, the federal government “maintains complete control of the safety and ‘nuclear’ aspects of energy generation” while the States “exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like.” Id. at 212, 103 S.Ct. 1713 (emphasis added). Indeed, the AEA expressly provides that “[njothing in this chapter shall be construed to affect the authority or regulations of any Federal, State or local agency with respect to the generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the [NRC].” 42 U.S.C. § 2018; see also 42 U.S.C. § 2021(k) (“Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards.”). This text strongly suggests Congress’s intent that the States retain authority to determine whether nuclear power, or energy from alternative sources, should be generated within their borders.
This conclusion is buttressed by what Congress omitted from the AEA. As mentioned, the AEA does not, either in its text or as the Supreme Court has construed it, force a State to approve the construction of a nuclear power plant. Pacific Gas, 461 U.S. at 205, 103 S.Ct. 1713. Nor does the AEA, either in its text or as construed, force a State to permit the continued operation of a nuclear power plant whose State-issued operating license has expired. Id. This is so even where the NRC has renewed the plant’s federally-issued operating license. See, e.g., Nuclear Regulatory Commission Report Regarding Vermont Yankee Nuclear Power Station, NUREG-1437, Supp. 30, Vol. 1 at § 1.4 (Aug.2007) (“Once an OL [Operating License] is renewed [by the NRC], State regulatory agencies and the owners of the plant will ultimately decide whether the plant will continue to operate based on factors such as the need for power or other matters within' the State’s jurisdic *437 tion or the purview of the owners.... [T]he NRC does not have a role in the energy-planning decisions of State regulators and utility officials as to whether a particular nuclear power plant should continue to operate”).
The parties have not directed our attention to any case in which the Supreme Court has struck down a State statute or tort judgment on AEA preemption. In Pacific Gas, 461 U.S. at 222-23, 103 S.Ct. 1713, the Court upheld California’s moratorium on nuclear construction, accepting, in the face of competing explanations, California’s avowed financial concerns as the rationale for the legislation. In Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 249, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the Court found that a “state-authorized award of punitive damages” against the operator of a nuclear power plant for contamination-related injuries did not “fall[] within the prohibited field.” And in English v. General Electric Co., 496 U.S. 72, 86, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), the Court concluded that the AEA did not preempt a state-law claim for intentional infliction of emotional distress brought against the operator of a nuclear power plant and arising out of perceived violations of nuclear-safety standards.
Further, as a practical matter, it seems impossible to divorce safety concerns from any State legislature’s consideration of whether to allow, or continue to allow, the generation of nuclear power within its borders. Even legislation that is ostensibly oriented solely to economic concerns — and therefore within the AEA’s savings clause as interpreted in Pacific Gas — can be expected to have some bearing on plant safety. But this should not doom the statute. As Justice Blackmun wrote in his Pacific Gas concurrence, “There is no evidence that Congress had a ‘clear and manifest purpose’ to force States to be blind to whatever special dangers are posed by nuclear plants.” 461 U.S. at 225, 103 S.Ct. 1713 (citation omitted). To conclude that State legislative history reflecting concern — even a primary concern, Maj. Op. at 420-21 — about nuclear safety is enough to invalidate a statute, even absent an actual conflict with federal regulatory requirements or meaningful intrusion into the field, could effectively disable the States from enacting legislation in the realm of nuclear energy production.- I am aware of no basis for concluding that Congress made such a choice.
Placing decisive emphasis on motivation to the exclusion of impact, as we do here, also creates an irresistible incentive for States to do their best to mask their concerns about safety. Further, the prominence of safety concerns in the record before us regrettably overshadows the legislature’s attempt to address economic issues, ones that the AEA’s savings clause protects. The original rationale supporting the savings clause’s protection for State economic legislation, see Pacific Gas, 461 U.S. at 207, 103 S.Ct. 1713, may have been undermined by the advent of the “merchant generator,” see Maj. Op. at 412-14. But, while Vermont Yankee provides energy across State lines, only the citizens of Vermont are faced "with the fiscal consequences of the adequacy or inadequacy of Entergy’s provisions to address potential financial dissolution. To rule that concern for safety is fatal to a State’s legislative initiatives is to disable the States from legislating within their borders to respond to the legitimate economic concerns of their citizens.
Thus, like the construction moratorium upheld in Pacific Gas, the statutes before us “do[ ] not seek to regulate the construction or operation of a nuclear power plant.” 461 U.S. at 212, 103 S.Ct. 1713. Unfortunately for Vermont, our analysis cannot *438 end there. As discussed above, under Pacific Gas, “[ajstate moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field.” Id. at 213, 103 S.Ct. 1713. Were I writing on a blank slate, I would be inclined to conclude that a State’s concerns for safety do not preempt its efforts to change its decision-making process or its ultimate decision, at a natural inflection point in the life of a nuclear power plant, that it -no longer wishes the plant to operate within its borders.
But there is no avoiding the Supreme Court’s teachings in Pacific Gas. The statutes before us are preempted, and I therefore must concur.